## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

MARK STANALAJCZO, DDS,

     Plaintiff,

v

UNIVERSITY OF MICHIGAN, the
REGENTS of the UNIVERSITY OF
MICHIGAN, BRANDONN PERRY, in
his individual capacity, and LYNN
JOHNSON, in her individual capacity,

     Defendants.

Case No.

**PLAINTIFF'S COMPLAINT
and JURY TRIAL DEMAND**

_____/

Dennis B. Dubuc (P67316)
Attorney for Plaintiff
ESSEX PARK LAW OFFICE, P.C.
12618 10 Mile Road
South Lyon, MI  48178
(248) 486-5508

_____/

### PLAINTIFF'S COMPLAINT
### FOR EQUITABLE RELIEF AND DAMAGES

### JURISDICTION

1.    Plaintiff seeks to vindicate rights protected by the First and Fourteenth

Amendments to the Constitution of the United States and by 42 U.S.C. §1983.

This court has jurisdiction over this civil action pursuant to 28 U.S.C. §1331 and

§1343(a) (3) and (4). Plaintiff seeks declaratory relief pursuant to §2201 and

§2202.

VENUE

2.      The events giving rise to the constitutional violations set forth in this action took place in Ann Arbor, Michigan and one or more of the Defendants reside in the Eastern District of Michigan.  Pursuant to 28 U.S.C. §1391(b), venue is proper in the United States District Court for the Eastern District of Michigan.

PARTIES

3.      Plaintiff Dr. Mark Stanalajczo is a licensed dentist in the State of Michigan with a degree of Doctor of Dental Surgery.  He is in his 34th year of private practice at the dental office he started and owns in Farmington Hills, Michigan.  In 2023, Plaintiff began his 25th year in the United States Army Reserve as an Individual Mobilization Augmentee ("IMA") Dental Officer, where in 2016 he had been promoted to the rank of Colonel.  He currently serves as the IMA Commander and is assigned to the active duty unit, Dental Health Command-Pacific.  Additionally, as further set forth in this Complaint, Plaintiff was employed at the Defendant University as an Adjunct Clinical Assistant Professor, where he taught both clinical and preclinical courses and he supervised students delivering patient care at the Defendant University's dental clinic.

4.      Defendant University of Michigan (the "University"), is a state-chartered university.  Defendant Regents of the University of Michigan constitute a body corporate of the State of Michigan that has supervisory control over the University.

2

*See* Mich. Const. Article VIII § 5; *Sterling v. Regents of the University of Michigan*, 110 Mich. 369, 68 N.W. 253 (1896).

5.     Defendant Brandonn Perry is employed by the University as the Director of Safety and Infection Prevention.   At all times relevant to this Complaint, Defendant Perry was acting under color of state law.  Defendant Perry is sued in his individual capacity.

6.     At all times relevant to this Complaint, Defendant Lynn Johnson was employed as an Associate Dean for Faculty Affairs and Institutional Effectiveness and she was acting under color of state law.  Defendant Johnson is sued in her individual capacity.

## COMMON FACTS

7.      In his capacity as a Colonel for the United States Army Reserve as an IMA Dental Officer, Plaintiff regularly visited Defendant University's School of Dentistry to speak with potential dental students about the Army Dental Corps. During one of those events in 2017, Plaintiff encountered Dr. Mark Snyder, a University dentist who indicated that the University was hiring part time instructors.  Dr. Snyder provided Plaintiff with the contact information for Dr. Ron Heys, a supervisory faculty member, who encouraged Plaintiff to apply for employment at the School of Dentistry.

8.     In December, 2018, Defendant University hired Plaintiff as an Adjunct Clinical Assistant Professor.

9.     During the summer of 2021, Plaintiff worked in the Defendant University's dental clinic on Thursday afternoons.  In doing so, Plaintiff was required to wear Personal Protection Equipment ("PPE").  This consisted of shower curtain-like gown (made out of plastic), an N95 facemask, a face shield and a head covering to supervise students who were working on patients at the clinic.

10.    The plastic gown did not allow individuals who wore them to cool down from perspiring; it was comparable to wearing a plastic bag.  The plastic gown caused excessive heat and perspiration.  Some of the older University instructors experienced issues with heat exhaustion due to the plastic gowns.

11.    Plaintiff asked Dr. Ron Heys when there could be a change in the PPE requirements because faculty, staff and students were having difficulties with the inability to keep cool with the plastic shower curtain gown.   Dr. Heys told Plaintiff that students and staff were going to have to wear the plastic gowns for quite a while because the school signed a 3-year contract for the plastic gowns.

12.    However, in August, 2021, the school supplied disposable gowns in addition to the shower curtain gowns.  The disposable gowns were breathable and this helped to address the overheating problems that many students, faculty and staff were having.  The University advised staff that it began to offer disposable gowns

because the dental clinics were hot during the summer months and because so many people were experiencing overheating problems. The school's air conditioning systems were (and always had been) undersized and overworked, leading to exceptionally hot conditions in the dental clinics.

13.     During the summer of 2021, the School of Dentistry was going through a entire school remodeling project that negatively affected the temperatures of the dental clinics over and above the elevated temperatures that were normally the result of the ineffective air conditioning systems. This created periods of insufferable temperature increases in the dental clinics while patient care was being delivered.

14.     In the late fall of 2021, the University ceased supplying disposable gowns for faculty, staff and students to wear.

15.     Some of the faculty Plaintiff worked with during his shift were older men in their 70's. Those faculty members spoke to Plaintiff about the soaked scrubs tops they had at the end of a 3-4 hour shift in the dental clinics and how hard it was on them physically. University employees in the dental clinic were not allowed to bring water bottles or any other drinks into the clinic. One of Plaintiff's colleagues was verbally reprimanded for having a water bottle that he had brought to work because of his overheating problems. This entire situation bordered on the intolerable, but no one from the administration would address it (Dr. Heys told

Plaintiff that the administration knew about the problem, but that no concern was exhibited).

16.    On June 15, 2022, Plaintiff received an email from Defendant Brandonn Perry, the Director of Safety and Infection Prevention at the School of Dentistry about the Personal Protective Equipment (PPE).  Mr. Perry's email was sent to all faculty, staff and students at the school.  Defendant Perry "recogniz[ed] that the clinics can be warm" and his email urged faculty, staff and students "not put yourself at risk and remove a piece of PPE during patient care because of the elevated temperature."  After suggesting some ineffective "solutions," Defendant Perry stated that disposable gowns would no longer be alternative piece of PPE equipment during the summers.  Placing his concern for the environment above the health and safety of the faculty, students and staff, Defendant Perry stated, "Last year, we had these gowns available all summer, [sic] however, [sic] Environment, Health & Safety expressed concerns with the huge amount of waste they produced and its [sic] impact on environmental sustainability."

17.    After receiving Defendant Perry's June 15, 2022 email, Plaintiff sent the following response via the "reply all" function:

> The solution is simple:
> Get rid of the plastic gowns that prevent natural cooling through perspiration and move to something that allows for breathing of our bodies.

Having worked in my own office for over 30 years without anything like that and never once "catching" anything at all through years of aerosoled exposure, these gowns are ridiculous.

I suggest you all wear them around all day for hours and experience what we all have to experience….frankly wearing these gowns puts our health at risk ... as your email acknowledges …

So what's the procedure for filing a health complaint about these?

Dr Mark Stanalajczo

18.    Because of Plaintiff's "reply all" email, Defendant Perry began to receive communications from University faculty and students that called into question the dangerous PPE policies that Defendant Perry and the University had put in place and allowed to continue.  For example, as a result of Plaintiff's "reply all" email to Defendant Perry, Associate Professor Carolyn Romzick sent to Defendant Perry an email dated June 15, 2022 that stated in relevant part:

I have to agree with [Plaintiff Dr. Mark Stanalajczo] on this one.  We have been struggling through the use of this oppressive PPE for two years.  With the reduction in Covid disease transmission noted by the CDC, it's time to return to a safer and healthier gown. * * * Since returning to clinic after the shutdown, we have had an exodus of adjuncts from the clinic floor teaching faculty and difficulty replacing them for a variety of reasons with the PPE shower curtain gown at the top of the list.

* * *

Brandon, I hope you will forward the comments in this email thread to the administrators so they understand the profound need to find a healthier and more professional alternative to the yellow gown that is currently required as part of our clinical PPE.

7

As another example of criticism of Defendant Perry's and the University's dangerous PPE policies, the Clinical Committee Representative Colleen Roland (Class of 2023) wrote to Defendant Perry:

> Since starting this program, I have witnessed 3 of my classmates pass out due to heat exhaustion while wearing the yellow gowns in the clinic. They were in ACE clinic and SIM lab and not in direct patient care when these incidents occurred. To that point, patient care requires much more energy, physically and mentally, than ACE or SIM lab. Body temperatures will rise and the risk of students and/or faculty passing out rises with it.
>
> * * *
>
> It is a challenge to fully focus on patient care when we have sweat dripping down our arms and torsos and pooling up under our gowns. Additionally, when we remove the gowns to walk our patients out, our scrubs are soaked through. Not only do we look unprofessional, I question the level of sanitation in that situation.

19.    Defendant Perry and University administration took no corrective action in response to the above concerns, as well as others that they received, which rebuked the dangerous conditions that Defendant Perry and the University had refused to correct.

20.    On June 16, 2022, Plaintiff filed a MiOSHA complaint with the State of Michigan. In support of his complaint, Plaintiff referenced the email Defendant Perry had disseminated as proof that the University knew its actions and decisions were compromising the health of its faculty, staff, students and patients. The University and Defendant Perry knew that there were options to mitigate these risks, but they were refusing to implement them. Plaintiff's MiOSHA complaint

requested a state investigation on the basis that "They choose to ignore complaints over the health of those working and providing care to patients." *See* **Exhibit 1**.

21.   On June 22, 2022, Scott MacFarlane, an investigator with MiOSHA, contacted the University in response to Plaintiff's complaint.  Mr. MacFarlane's investigation involved speaking with University employees and informing them that he would be requesting a written response to Plaintiff's MiOSHA complaint.

22.   On June 23, 2022, MiOSHA Investigator MacFarlane sent a letter to Danielle Sheen, Executive Director, Environment, Health & Safety, requesting an official response to Plaintiff's MiOSHA complaint.   Mr. MacFarlane's letter requested that "all" Dental School employees be made aware of the ongoing investigation, specifically stating, "You are requested to post a copy of this letter and your response where they will be readily accessible for review by all of your employees until MIOSHA deems the case closed."

23.   On June 28, 2022, Mr. MacFarlane received the University's written response to Plaintiff's complaint and Mr. MacFarlane determined that the response was acceptable.  Mr. MacFarlane advised Defendant University that "Our letter and your response may be removed from their posting locations."  The MiOSHA complaint that Plaintiff filed was then closed.

24.   After MiOSHA had contacted the University and closed Plaintiff's complaint, University administrators decided to hold a school-wide town hall

meeting to discuss the ongoing PPE issues.  In acknowledging the "difficult conditions during the pandemic along with inconsistent air conditioning due to the building renovation," Defendant Perry and three other administrators sent an email to the "Dentistry Schoolwide" distribution list stating, in relevant part:

> We are planning a forum to discuss the clinical gowns and PPE protocol.  While this discussion will be focused on the gowns and PPE in pre-doctoral and dental hygiene clinics, all clinical staff and faculty in the school are welcome to attend.

25.    Before the time that the "town hall meeting" was scheduled, Plaintiff requested to have two weeks off so he could perform his required, annual two-week military training.  Plaintiff requested the weeks of July 11, 2022 and July 18, 2022 off.  The Defendant University decided to hold the meeting on July 11th – at a time when Plaintiff would not be able to physically attend the meeting.

26.    Plaintiff had told multiple people that he could not participate in the meeting since he would be on active duty in Hawaii, and not knowing what his Army schedule would be.  Plaintiff was informed that a Zoom option existed for participants who could not physically attend.

27.    On July 11th, there were no Army meetings scheduled for Plaintiff and since he had no other commitments that day, and because the meeting was during his lunch time, Plaintiff logged-in via Zoom to watch the University "town hall meeting."

28.    The meeting started with an unknown female reading prepared remarks. Plaintiff did not know the individual, she did not introduce herself and no one else identified her.   Participants in the Zoom chat started asking who the unknown female was.   No one stated that they knew.   After she was finished, each and every subsequent speaker introduced themselves and identified their role at the University.

29.    Although Plaintiff originally did not intend on speaking at the meeting, a number of students started sending him private messages via the chat, requesting that he speak up.   Because Plaintiff was on lunch during his army training, he decided to express his opinion publicly at the town hall Zoom meeting.

30.    When the "public comments" section occurred at the end of the meeting, Plaintiff raised his hand on Zoom and he waited.   Plaintiff was not called on. However, Dr. Larry Miller, interjected and he brought to the attention of those running the meeting that Plaintiff had his hand raised to speak. Finally, Plaintiff was acknowledged and he was allowed to speak.

31.    During Plaintiffs speech, he informed all of the participants that he had filed a MiOSHA complaint concerning the University's directive to wear the yellow shower curtain gowns and the heat-related issues that the gowns were causing.

32.    Plaintiff began his speech by mentioning that the person who started the meeting did not introduce herself and Plaintiff made the comment, that whomever

the person was who started the meeting, was rude because no one knew who she was.  Plaintiff stated that a meeting about PPE in a school-wide forum was long overdue and he reiterated the points that he had made in his MiOSHA complaint. *See* **Exhibit 1**.

33.    The meeting ended with the unknown female who had started the meeting forcing her way back to the microphone to introduce herself as Dr. Jan Hu, interim Dean of the School of Dentistry.   The meeting abruptly ended immediately thereafter.

34.    The University of Michigan *Freedom of Speech and Artistic Expression Policy* encourages faculty, staff and students to use such forums, such as the town hall meeting that took place on July 11, 2022, to express themselves without fear of retaliation.  The Policy states, in relevant part:

> Freedom of speech in this context will be taken to encompass all forms of communication and artistic expression as well as the freedom to listen, watch, protest, or otherwise participate in such communication. It is hoped that this reaffirmation will win the support, in spirit and in letter, of people representing the entire spectrum of opinion of the University community in order to create a truly open forum, one which diverse opinions can be expressed and heard.

> Expression of diverse points of view is of the highest importance, not only for those who espouse a cause or position and then defend it, but also for those who hear and pass judgment on that defense. The belief that an opinion is pernicious, false, or in any other way detestable cannot be grounds for its suppression.

When a speech or some form of artistic expression such as a play or concert is prevented by disruptive protest from taking place or concluding, the effect is just as surely an attack on freedom of speech or artistic expression as the deliberate suppression or prohibition of a speaker or artist by authorities. At the same time, however, the rights of free expression enjoyed by speakers or performers do not negate the rights of free expression of those who would protest the speech or performance.

* * *

GUIDELINES

1.     It is the right of members of the University community (including students, faculty, staff, and administrators), speakers, artists, and others invited by members of the University community to set forth their views and opinions at the University.

2.     Within its lawful authority to do so, the University will protect the right of any member of the University community, or any invited speaker or artist, to speak or perform, and also will protect the rights of those members of the University community who wish to hear and communicate with an invited speaker or artist. …

35.    Despite Plaintiff's clear and indisputable right to engage in free speech involving matters of public concern, following the July 11th meeting, Defendant Perry, the School of Dentistry's Director of Safety and Infection Prevention, retaliated against Plaintiff for his public criticism of the University's and Defendant Perry's reckless PPE policies.  Defendant Perry retaliated by leveling the following baseless and unsupported charges with Defendant Lynn Johnson, the Associate Dean for Faculty Affairs and Institutional Effectiveness:

Dr. Mark Stanalajczo made degrading comments about the Dean in a public meeting on July 11, 2022.  His demeanor and words used during the meeting were unprofessional and incendiary.  He has also sent unprofessionally worded emails and has "responded all" to emails creating an unnecessary burden on faculty and staff to read and

13

respond to these emails.  His behavior has been counterproductive and doesn't seem to be intended to resolve an issue via constructive criticism and discourse.  Rather, his words and behavior have served to demean and lower the morale of faculty, staff, and students.

36.   On July 29, 2022, Defendant Lynn Johnson notified Plaintiff that she had received the complaint identified above from Defendant Perry concerning Plaintiff's behavior at the July 11th town hall meeting and that Defendant Johnson intended to move forward on Defendant Perry's complaint.

37.   On August 2, 2022, the undersigned counsel for Plaintiff emailed to Defendant Johnson a communication requesting, in relevant part, that Defendant Perry's complaint be dismissed because "it is vague, uncertain and ill-defined [with] no specifics to be ascertained."  In order to bring clarity to the matter, it was requested that Defendant Johnson "address Mr. Perry's complaint, not by conducting an investigation, but by first demanding that he refile his complaint with specific statements concerning exactly what degrading statements he alleges Dr. Mark Stanalajczo made…".  Defendant Johnson refused those reasonable requests and she proceeded forward with Defendant Perry's complaint.

38.    On August 3, 2022, Dr. Hu apologized to Plaintiff.  This apology took place during a meeting of administrators and several faculty.  Had Dr. Hu – the school's interim Dean – felt that Plaintiff acted unprofessionally at the July 11th town hall meeting, Dr. Hu would not have apologized to him.

14

39.     Defendant Johnson initiated a pretextual, biased and corrupt investigation, noting at the outset:

> The [July 11, 2022] meeting was a hybrid meeting that included about 40-50 attendees in person and 50-60 participants on zoom.  Faculty, staff and students were invited. The topic was about the PPE that is worn in the clinics.  Prior to the meeting it was decided not to record the meeting so that participants could feel comfortable and not fear retaliation if they expressed a concern. (emphasis added)

40.     Defendant Johnson next proceeded to cherry pick various "witnesses" who were willing to express some form of feigned outrage at Plaintiff's comments during the July 11th meeting.  Defendant Johnson's biased investigation did not reveal any effort to interview the faculty or students who openly criticized the University and Defendant Perry's reckless and dangerous PPE policies at the July 11th public meeting.  Those July 11th participants would be unwilling to express the manufactured affront that Defendant Johnson was seeking from "witnesses" in her pretextual "investigation."   Defendant Johnson had access to the emails from faculty and staff that supported Plaintiff, but she chose to ignore them.

41.     On October 14, 2022, Defendant Lynn Johnson sent counsel for Plaintiff a 10-page report concluding that Plaintiff was guilty of misconduct. The report began by noting that "Lynn Johnson, Associate Dean for Faculty Affairs and Institutional Effectiveness, [produced the report]."

42.     In Defendant Johnson's retaliatory and biased report, she accused Plaintiff of "us[ing] the 'Reply all' function to send an 'emotionally charged' response" to

Defendant Perry.   However, Defendant Johnson did not identify what was "emotional" or "charged" in Plaintiff's communication.  This portion of Defendant Johnson's report was pretextual, as the real reason for her conclusion was Plaintiff's protected MiOSHA complaint activity and public speech that was directed towards Defendant Perry's and the University's dangerous PPE policies. In fact, on the subsequent page of Defendant Johnson's report, she noted that "<u>the meeting</u> was emotionally charged [and that] Mr. Perry feels that the clinic faculty, staff and students who must wear PPE have wanted changes for a while." (emphasis added).

43.    As noted above, Defendant Johnson's retaliatory and pretextual report acknowledged that "Prior to the [July 11th] meeting it was decided not to record the meeting so that participants could feel comfortable and not fear retaliation if they expressed a concern."  However, when Plaintiff expressed his concerns on matters of public interest, he was subjected to the unlawful retaliation set forth in this Complaint, including Defendant Johnson's pretextual "investigation."

44.    After repeating ambiguous accusations of "unprofessional" and "rude" behavior on Plaintiff's part, Defendant Johnson's retaliatory and pretextual report concluded, in relevant part:

> Based on the interviews with five staff members and three faculty, the preponderance of the evidence supports Mr. Perry's accusation that Dr. Stanalajczo did not demonstrate respectful and professional discourse during the July 11, 2022 PPE town hall.  In addition, a

review of five email threads revealed a lack of respect and professionalism.

* * *

The evidence supports the complaint of disrespectful and unprofessional behavior in a town hall and Dr. Stanalajczo's use of email. * * * Thus, it is recommended that he be removed from clinical teaching, use of U-M IT resources and having access to the dental building until he has completed the following education activities:

- Courses:
  - Dr. Stanalajczo should view the video Rarely reply all in an email. [video links omitted]

  - Dr. Stanalajczo should view these two videos about being a professional. [video links omitted]

- Dr. Stanalajczo should demonstrate all three-course completions by submitting the end of the course certificates or showing course completion history at LinkedIn (linkedin.com - learning - my-library - learning history - completed).

- Dr. Stanalajczo should write a summary of what he has learned, including a reflection upon the following topics:

  - How his email correspondence going forward will change including the use of reply.

  - His understanding of the school's expected standards for professional interactions with colleagues, including those colleagues with whom he disagrees.

* * *

Dr. Stanalajczo should submit the certificate of completion and written reflection documents to kromine@umich.edu by October 31, 2022. These items will be reviewed by the Executive Committee, and upon satisfactory completion of the recommendations, his teaching privileges, IT resources and building access will be reinstated.

17

Dr. Stanalajczo should understand that noncompliance with the Executive Committee's request, additional instances of disrespectful and unprofessional behavior, or misuse of email would be grounds for further disciplinary action, up to and including dismissal.

45. Defendant Johnson's pretextual report purported to be on behalf of the "Executive Committee" and it notified Plaintiff he was suspended from October 14, 2022 until the October 31, 2022 deadline expired for Plaintiff to complete the "recommended" disciplinary requirements.

46. This suspension constituted a constructive dismissal because rather than directly discharging him at that time, Defendants University and Johnson imposed unreasonable conditions on Plaintiff that were designed to place him in an intolerable and humiliating situation. Plaintiff declined to subject himself to the "recommended" disciplinary requirements set forth by Defendant Johnson.

47. In a letter dated November 1, 2022, Defendant Lynn Johnson communicated to Plaintiff that because he did not "provide any verification" that he met the "recommendations" of the Executive Committee set forth in her report, Plaintiff's employment was terminated.

## CONSTITUTIONAL CLAIMS

## COUNT I
## (THE MIOSHA COMPLAINT)
## UNCONSTITUTIONAL RETALIATION UNDER THE FIRST AND
## FOURTEENTH AMENDMENTS
## AND 42 USC §1983

48.    Plaintiff hereby restates and incorporates the paragraphs above.

49.    Plaintiff's complaint to MiOSHA was constitutionally protected conduct for which he could not be lawfully punished by his employer.

50.    An adverse action was taken against Plaintiff, such that he was terminated from employment with the Defendant University in retaliation for his filing the MiOSHA complaint.   A termination of employment is adverse action that would deter a person of ordinary firmness from reporting violations of law to state investigative (MiOSHA) authorities.

51.     There is a causal connection between Plaintiff's protected activity and his termination such that the adverse action was motivated at least in part by Plaintiff's protected conduct.

52.    Defendant University cannot censor the speech of its employees as a matter of course, and cannot condition public employment on a basis that infringes an employee's constitutionally protected interest in freedom of speech or expression. However, Defendant University did so here, to the injury and legal detriment of Plaintiff.

53.    In filing his MiOSHA complaint, Plaintiff spoke on matters of public concern, including the dangers that the PPE equipment was causing to student, faculty and patients.

54.     In filing his MiOSHA complaint, Plaintiff spoke as a private citizen and not as an employee pursuant to his official duties.

55.     Plaintiff's speech interest outweighs the interest of the University, as an employer, in promoting the efficiency of the public services it performs through its employees.

56.     Allegations that University officials had created a dangerous working environment in its dental clinics are exactly the type of statements that demand strong First Amendment protections.

57.     It is not within Plaintiff's job duties to report workplace violations such as PPE abuse to state authorities. Plaintiff was not obligated by his position to file the MiOSHA complaint at issue in this lawsuit.

58.     Plaintiff spoke as a citizen when he filed his MiOSHA complaint about the adverse effects that the University's PPE policies were having on dental school faculty, students and patients. Plaintiff's speech (his MiOSHA complaint, **Exhibit 1**) addressed a matter of public concern and he had a protected right not to be terminated for engaging in such speech and expressive activity.

59.     Defendants have violated Plaintiff's constitutional rights in terminating his employment. What makes the Defendants' conduct particularly egregious is the University's own policy that encourages its employees to express themselves on matters of public concern without fear of reprisal. *See, University of Michigan*

20

*Freedom of Speech and Artistic Expression Policy* ("The belief that an opinion is pernicious, false, or in any other way detestable cannot be grounds for its suppression.") *See also, Sweezy v. New Hampshire*, 354 U.S. 234, 251; 77 S. Ct. 1203; 1 L. Ed. 2d 1311 (1957) ("Mere unorthodoxy or dissent from the prevailing mores is not to be condemned. The absence of such voices would be a symptom of grave illness in our society.")

60.    Plaintiff has suffered damages and he seeks monetary and injunctive relief in an amount to be determined at trial. Plaintiff is entitled to reinstatement of his position at the Defendant University as an Adjunct Clinical Assistant Professor, with full back pay and associated benefits.

61.    Defendants have no viable claim to qualified immunity because a reasonable University official would have understood that the retaliation set forth in this Complaint violated a clearly established right. *Chappel v. Montgomery Cty. Fire Prot. Dist.* No. 1, 131 F.3d 564, 580 (6th Cir. 1997) (noting that "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern"); *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994) (noting that "[t]he law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional, and 'retaliation claims' have been asserted in various factual scenarios"). The case law in this Circuit provided Defendants fair warning

that they "may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity." *Bloch v. Ribar*, 156 F.3d 673, 682 (6th Cir. 1998).

62.    As to Count I of this Complaint, Defendants' acts were done and committed knowingly, deliberately and maliciously, with the intent to oppress, injure and harass Plaintiff, and with reckless indifference to the civil rights of Plaintiff; and by reason thereof, Plaintiff prays for punitive and exemplary damages from and against these Defendants in an amount according to proof at trial.

## COUNT II
## (PLAINTIFF'S PROTECTED ACTIVITY AT THE 7/11/22 MEETING)
## UNCONSTITUTIONAL RETALIATION UNDER THE FIRST AND
## FOURTEENTH AMENDMENTS
## AND 42 USC §1983

63.    Plaintiff hereby restates and incorporates the paragraphs above.

64.    Plaintiff engaged in constitutionally protected activity when he spoke at the July 11, 2022 "town hall" meeting and he communicated about the adverse effects that the University's PPE equipment was having on University staff, faculty and patients.  Defendant Johnson's report of October 14, 2022, referred to the town hall meeting as a "very public forum."

65.    Plaintiff's speech during the July 11th meeting was not that of an employee speaking pursuant to his official duties, but rather in his capacity of a citizen and addressing matters of public concern.  Moreover, the University has a policy that

22

encourages its faculty to speak without fear of retaliation about matters of public concern.

66.    Plaintiff was not commissioned or paid to make the speech on July 11th.  In fact, Plaintiff was on a lunch break during his Army training on the day in question and he spoke at the town hall meeting via Zoom as a private citizen.

67.    Plaintiff's speech was not made up the chain of command, as it took place in a public forum, a town hall meeting that was open to faculty, students, staff and others.

68.    Plaintiff's speech addressed a community matter that concerned the quality and level of care that the University's dental clinic offered to the public.

69.    Plaintiff's speech at the meeting was protected activity.   Plaintiff spoke as a citizen about the effect of PPE equipment upon dental clinic operations during the COVID-19 pandemic, which is unquestionably a matter of public concern, and Plaintiff's interest as a citizen in speaking on this matter outweighs the University's interest as an employer. *McLaughlin v. Sullivan Cnty. Bd. of Educ.*, No. 2:20-CV-00243, 2021 U.S. Dist. LEXIS 159799 at *7-8; 2021 WL 3744803 (E.D. Tenn., August 24, 2021) ("Plaintiff spoke as a citizen about returning to in-person learning during the COVID-19 pandemic, which is unquestionably a matter of public concern…"), *citing Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 578 (6th Cir. 1997) ("Speech on matters directly affecting the health

23

and safety of the public is obviously a matter of public concern.") and *Ellison v. Knox Cnty.*, 157 F.Supp.3d 718, 722 (E.D. Tenn. 2016) (holding that matters affecting the safety of schoolchildren and faculty are of public concern). *See also*, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968) ("[A] teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment.").

70.    A termination of employment creates negative consequences that would likely chill or silence a person of ordinary firmness from speaking in the future.

71.    There is a causal connection between the protected speech at issue here and the adverse action.    While the University has stated that it was Plaintiff's unprofessional conduct that resulted in his termination, including Plaintiff's improper use of the "reply all" email function, the University's position is pretextual.  The University suspended Plaintiff because of his *protected speech* at the town hall meeting that criticized the University's and Defendant Perry's reckless PPE policies that put faculty, staff, students and patients at risk of harm.

72.    The University has fabricated a pretextual basis for Plaintiff's termination so that it could subsequently claim to this Court that his protected conduct played no role in its decision to terminate him.  That ruse should be summarily rejected because "A defendant's motivation for taking action against the plaintiff is usually

a matter best suited for the jury." *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir. 2010).

73.     Failure to adhere to University policy can constitute circumstantial evidence of pretext and here, Defendants did not adhere to the University policies that protected Plaintiff's speech-related activities that it used as a basis to terminate him.  Plaintiff's use of the "reply all" email function did not constitute employee misconduct and his alleged "unprofessionalism" had no basis in fact.  The findings set forth in Defendant Johnson's report were not legitimate factors motivating Plaintiff's discharge, but rather they were the smokescreen used to terminate Plaintiff for his protected public speech in a public forum.  The grounds used by the Defendant University to terminate Plaintiff's employment are unworthy of credence.

74.     As to Count II of this Complaint, Defendants' acts were done and committed knowingly, deliberately and maliciously, with the intent to oppress, injure and harass Plaintiff, and with reckless indifference to the civil rights of Plaintiff; and by reason thereof, Plaintiff prays for punitive and exemplary damages from and against these Defendants in an amount according to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff seeks the following forms of relief:

25

A.     Declare that Defendants violated Plaintiff's First and Fourteenth Amendment rights when they retaliated against him for filing a MiOSHA complaint;

B.      Declare that Defendants violated Plaintiff's First and Fourteenth Amendment rights when they retaliated against him for speaking at the July 11th town hall meeting about matters of public importance;

C.     Award Plaintiff all available damages allowable by law, including compensatory and presumed damages for the repeated violations of his constitutional rights, along with all interest authorized by law;

D.     Award Plaintiff his costs, reasonable attorneys fees, and disbursements incurred in this action;

E.     Assess punitive and exemplary damages from and against each Defendant, given the willful, intentional and bad faith conduct outlined above;

F.     Declare that Plaintiff is entitled to restoration of his employment with the Defendant University, with an award of all back pay and associated benefits; and

G.     Grant such other and further relief as the Court may deem just and proper.

Dated: June 27, 2023                    Respectfully submitted:

                                        s/Dennis Dubuc_____
                                        Dennis B. Dubuc (P67316)
                                        Attorney for Plaintiff
                                        Essex Park Law Office, P.C.
                                        12618 10 Mile Rd.
                                        South Lyon, MI  48178
                                        (248) 486-5508


## JURY TRIAL DEMAND

Pursuant to Fed.R.Civ.P. 38(b), Plaintiff respectfully demands a trial by jury in this matter.

Dated: June 27, 2023                    Respectfully submitted:

                                        s/Dennis Dubuc_____
                                        Dennis B. Dubuc (P67316)
                                        Attorney for Plaintiff
                                        Essex Park Law Office, P.C.
                                        12618 10 Mile Rd.
                                        South Lyon, MI  48178
                                        (248) 486-5508