UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK STANALAJCZO, DDS,

     Plaintiff,

                                    Case No. 23-cv-11527

v.                                 Hon. Matthew F. Leitman

BRANDONN PERRY, *et al.*,

     Defendants.

_____/

## <u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 48)</u>

The summer of 2022 was a tough time for students and faculty working in the patient clinic (the "Clinic") at the University of Michigan School of Dentistry (the "Dental School"). The Dental School required them to wear, as personal protective equipment ("PPE"), a heavy style of gown that many likened to a "shower curtain." At the same time, the air conditioning units that serviced the Clinic were not cooling the building at their normal capacity. The combination of the heavy gowns and the warm air made many students and teachers miserable.

Some of them, including Plaintiff Mark Stanalajczo, D.D.S, an adjunct faculty member, raised concerns about the conditions in the Clinic. Dr. Stanalajczo filed a complaint about the conditions with the Michigan Occupational Safety and Health Administration ("MIOSHA") and spoke up at a "town hall" meeting convened by

Dental School administrators to discuss the Clinic's working conditions. According to Dr. Stanalajczo, the Dental School administration did not much care for his statements to MIOSHA and at the town hall. He says that they were so put off by his remarks that they fired him for having made them. In this action, Dr. Stanalajczo brings two claims of First Amendment retaliation against the Dental School and several of its administrators.

Now before the Court is Defendants' motion for summary judgment. (*See* Mot., ECF No. 48.) In the motion, Defendants argue that Dr. Stanalajczo's claims fail as a matter of law because his complaint to MIOSHA and his statements at the town hall meeting were not protected speech. The Court agrees. Dr. Stanalajczo's MIOSHA complaint was not protected because it did not address a matter of public concern. And his statements at the town hall were not protected because he made them in his capacity as a Dental School employee, not as a private citizen. The Court therefore **GRANTS** Defendants' motion for summary judgment.[1]

---

[1] On January 27, 2025, Dr. Stanalajczo filed a motion in which he requested that the Court hold oral argument on Defendants' motion. (*See* Mot., ECF No. 54.) The Court held such an in-person hearing on June 12, 2025. Thus, because the Court held a hearing on Defendants' motion, the Court **TERMINATES** Dr. Stanalajczo's motion as moot.

# I

## A

Dr. Stanalajczo is a graduate of the Dental School who has been practicing general dentistry for approximately 35 years. (*See* Stanalajczo Dep. at 7:16-25, ECF No. 48-2, PageID.776.)   In 2019, Dr. Stanalajczo began working as an adjunct assistant clinical professor at the Dental School. (*See id.* at 11:14-21, PageID.777.) He worked in the Clinic one day per week. (*See id.* at 14:2-8, PageID.778.)

## B

When faculty and students returned to the Clinic after the onset of the COVID-19 pandemic, the Dental School required them to wear PPE that included "long, fluid resistant" yellow gowns. (Dep. of Brandonn Perry, Dir. of Safety and Infection Prevention, at 37:21-38:3, ECF No. 48-3, PageID.794-795.)   The gowns were made up of a 99% polyester and 1% carbon material blend. (*See* Resp. to MIOSHA Compl., ECF No. 48-4, PageID.818.)

Students and faculty working in the Clinic in the summer of 2022 did not like the gowns.  They said that wearing the gowns was like wearing "shower curtain[s]" because they were "sticky" and "hot" on the inside. (Perry Dep. at 38:7-24, ECF No. 48-3, PageID.795; *see also* Decl. of Laurence Miller, D.D.S., Adjunct Clinical Assistant Professor, at ¶ 5, ECF No. 50-2, PageID.1004; Decl. of Carolyn Romzick, D.D.S., Adjunct Clinical Assistant Professor, at ¶ 4, ECF No. 50-3, PageID.1010-

1011.)  They felt that the gowns "trapped body heat and made working not just uncomfortable but unhealthy. Perspiration soaked [their] underlying scrubs causing rapid dehydration, light-headedness, dizziness, thirst, and low blood oxygen saturation levels." (Romzick Decl. at ¶ 3, ECF No. 50-3, PageID.1010-1011.)

At the same time that the Dental School was requiring students and faculty in the Clinic to wear the heavy gowns, it was completing renovations to certain portions of the Dental School campus. (*See* Dep. of Jacques Nor, Dental School Dean, at 20:4-19, ECF No. 48-5, PageID.833.)   The renovations resulted in the air conditioning "not working properly" in the Clinic. (Miller Decl. at ¶¶ 7–8, ECF No. 50-2, PageID.1004-1005; *see also* Romzick Decl. at ¶ 4, ECF No. 50-3, PageID.1010-1011.)  As a result, "[a]mbient clinic air temperatures ran high" and "added to the body heat trapped under [the] gowns." (Romzick Decl. at ¶ 4, ECF No. 50-3, PageID.1011.)

## C

The Dental School administration recognized that the combination of the heavy gowns and the poorly functioning air conditioning system was creating uncomfortable working conditions for students and faculty in the Clinic.  On June 15, 2022, three Dental School administrators – Brandonn Perry, Director of Safety and Infection Prevention, Romesh Nalliah, Associate Dean for Patient Care, and

Michael Folk, Building Manager – sent an email addressing Clinic conditions to those working in the Clinic.  The email provided as follows:

> Dear Clinical Colleagues,
>
> We are all excited about the warm weather and the arrival of summer, however, we recognize that the clinics can be warm. Please do not put yourself at risk and remove a piece of PPE during patient care because of the elevated temperature. Instead, here are a few tips to keep you safe to prevent heat illness:
>
> - Take frequent breaks and increase your fluid intake.
> - Look out for your colleagues. If you see signs of heat exhaustion, please say something.
> - If the clinic is excessively hot, please report it to facilities management.
>
> We recognize that 72 degrees might be perfectly comfortable for one person, but could be extremely uncomfortable for someone else. Therefore, it is critical that you pay attention to your own well-being.
>
> This summer we will have new Predoctoral/Hygiene clinics and new airflow systems - the temperature management system will be the most effective it has been in a long time. Our building structure and systems mean that, when the outside temperature exceeds 88 degrees, it is difficult to maintain our temperature below 72 degrees inside.
>
> On days that we reach or exceed an outside air temperature of 88 degrees, we will endeavor to have disposable gowns available. Last year, we had these gowns available all summer, however, Environment, Health & Safety expressed concerns with the huge amount of waste they produced and its impact on environmental sustainability.

> Additionally, we are continuously seeking other solutions in gowns and working with our building manager to maintain temperature control in the clinical spaces. I encourage you to review what PPE is required when engaged in patient care activities. Thank you for making safety and infection prevention your priority!

(6/15/2022 Perry Email, ECF No. 48-6, PageID.845-848.)

Dr. Stanalajczo responded to the email as follows:

> The solution is simple:
>
> Get rid of the plastic gowns that prevent natural cooling through perspiration and move to something that allows for breathing of our bodies.
>
> Having worked in my own office for over 30 years without anything like that and never once "catching" anything at all through years of aerosoled exposure, these gowns are ridiculous.
>
> I suggest you all wear them around all day for hours and experience what we all have to experience….frankly wearing these gowns puts our health at risk..as your email acknowledges….
>
> So what's the procedure for filing a health complaint about these?

(6/15/2022 Stanalajczo Email, ECF No. 48-6, PageID.849.)

When Dr. Stanalajczo sent this email, he selected "reply to all," and it was therefore delivered to all of the students and faculty who had received the original email. (*See id.*)  Around the same time that Dr. Stanalajczo sent his email, other faculty and students began sending "reply to all" emails in response to the original

email, and these emails, like the one sent by Dr. Stanalajczo, raised concerns about the gowns and building temperatures. (*See id.*, PageID.851-855.)

The Dental School administration ultimately recognized that the challenges posed by the gowns and the poorly functioning air conditioning system were sufficiently "complex" that they could not be resolved "by email." (6/15/2022 Nalliah Email, ECF No. 48-6, PageID.855.)   Accordingly, the administration decided to convene "a schoolwide forum on the topic of gowns." (*Id.*)   The administration then scheduled a town hall meeting to "discuss the[] issues" raised in the emails. (Nor Dep. at 21:22-23, ECF No. 48-5, PageID.833.)

### D

On June 16, 2022 – after the exchange of the "reply to all" emails but before the schoolwide forum – Dr. Stanalajczo filed a complaint about Clinic working conditions with MIOSHA. (*See* MIOSHA Complaint, ECF No. 19, PageID.243.) His MIOSHA complaint stated, in full:

> The school makes their employees wear a non breathable plastic shower curtain material while treating patients. This garment creates a known issue with body overheating and the employer has sent emails informing employees that they know this garment is hazardous to their health by creating a heat illness while wearing the garment even after acknowledging that there are alternatives that won't cause these issues and they won't supply them. They stated that even though they know people have had overheating problems because of this garment, that they area more concerned with the waste disposable garments

> create than the continued health issues many employees
> and students have had happen to them.
>
> The employer has been made aware of the problem and
> has repeatedly failed to correct it causing employees[']
> health to be sacrificed as a result. They choose to ignore
> complaints over the health of those working and providing
> care to patients.

(*Id.*)

The Dental School filed a response to Dr. Stanalajczo's MIOSHA complaint. (*See* Resp. to MIOSHA Compl., ECF No. 48-4.)  In that response, the Dental School said that it had "conducted an onsite investigation" and found that the gowns "[met] the requirements" of the American National Standards Institute and the Association for the Advancement of Medical Instrumentation. (*Id.*, PageID.810.)  It further explained that it was "aware of the feedback" regarding the gowns and was "seek[ing] other solutions," but it emphasized the importance of clinical staff wearing PPE while treating patients. (*Id.*, PageID.811.)  The Dental School finally opined that Dr. Stanalajczo's allegations did not "describe a hazardous work condition, but rather an individual comfort issue for which solutions exist." (*Id.*, PageID.812.)

After reviewing the Dental School's response, MIOSHA closed the matter. MIOSHA "consider[ed] [the Dental School's] response to be satisfactory" and decided not "to conduct an onsite inspection at [that] time." (6/28/2022 MIOSHA Letter, ECF No. 48-9, PageID.863.)

8

**E**

On July 11, 2022, the Dental School held the schoolwide town hall. (*See* Perry
Dep. at 114:15-23, ECF No. 48-3, PageID.799.)  The forum was open "only to the
school of dentistry," not to the general public. (*Id.* at 119:6-9, PageID.800.)  It was
held in one of the lecture halls at Dental School, so only those with "access to the
school" could attend. (*Id.* at 118:20-21, 120:10-11, PageID.800.)  Members of the
Dental School community could also access the forum by Zoom, so long as they
used a "Zoom ID and pass code." (*Id.* at 123:19-21, PageID.801.)  Two Dental
School administrators – Dr. Nalliah and Jan Hu, the Interim Dean of the Dental
School – presided over the forum. (*See* Hu Dep. at 16:24-25, ECF No. 50-8,
PageID.1200; Perry Dep. at 113:17-18, 120:23-25, ECF No. 48-3, PageID.798, 800.)
The forum was not recorded because the Dental School administration wanted
attendees to "feel comfortable to express their concerns." (Perry Dep. at 117:2-21,
ECF No. 48-3, PageID.799.)

The forum eventually devolved into a "heated discussion" during which
students and faculty "complain[ed] about the . . . yellow gowns." (Hu Dep. at 17:8,
17:11-13, ECF No. 50-8, PageID.1201.)  Some attendees "voiced their opinion on
the difficulty of following the mandatory gowns and PPE require[ment] . . . and how
it affected their health because of overheating and discomfort." (Decl. of Earl K.

Bogrow, D.D.S., Adjunct Clinical Assistant Professor, at ¶ 7, ECF No. 50-14, PageID.1306.)

Dr. Stanalajczo participated in the forum via Zoom. (*See* Stanalajczo Dep. at 59:19-21, ECF No. 48-2, PageID.785.) When it was his turn to speak, he "expressed his concerns that the PPE equipment was adversely affecting the health and safety of the faculty, students[,] and patients." (Bogrow Decl. at ¶ 9, ECF No. 50-14, PageID.1307.) He "also spoke about the [MIOSHA] complaint that he had filed against the school." (*Id.*)

Some attendees at the forum felt that Dr. Stanalajczo expressed his opinions in a rude and unprofessional manner. (*See* Confidential Workplace Investigation Report, ECF No. 48-13, PageID.893-896.) Others, however, felt that Dr. Stanalajczo expressed himself reasonably and professionally in standing up for faculty and students. (*See, e.g.*, Miller Decl. at ¶ 17, ECF No. 50-2, PageID.1008; Romzick Decl. at ¶ 18, ECF No. 50-3, PageID.1016; Bogrow Decl. at ¶ 8, ECF No. 50-14, PageID.1306).

**F**

Perry (who, as noted above, was the Dental School's Director of Safety and Infection Prevention), was one of the forum attendees who felt that Dr. Stanalajczo behaved inappropriately at the forum. Two days after the forum, Perry filed a complaint against Dr. Stanalajczo with the Dental School's human resources

department. (*See* Perry Dep. at 131:6-137:1, ECF No. 48-3, PageID.803-804; Johnson Dep. at 41:17-23, ECF No. 48-11, PageID.872.)  In the complaint, Perry said that Dr. Stanalajczo's "demeanor and words used" during the forum were "unprofessional and incendiary." (Confidential Workplace Investigation Report, ECF No. 48-13, PageID.890.)  Perry also complained about Dr. Stanalajczo's use of "reply all" to the email chains concerning the gowns. (*Id.*)  Perry wrote that Dr. Stanalajczo's "behavior has been counterproductive and doesn't seem to be intended to resolve an issue via constructive criticism and discourse. Rather, his words and behavior have served to demean and lower the morale of faculty, staff, and students." (*Id.*)

The Dental School assigned Lynn Johnson, Professor and Associate Dean for Faculty Affairs and Institutional Effectiveness, to investigate Perry's complaint against Dr. Stanalajczo. (*See* Confidential Workplace Investigation Report, ECF No. 48-13, PageID.890.)  As part of that investigation, Dr. Johnson interviewed several Dental School faculty members.

At the conclusion of her investigation, Dr. Johnson prepared a report outlining her conclusions and recommendations. (*See id.*)  She determined that "[t]he evidence support[ed] the complaint of disrespectful and unprofessional behavior [at the] town hall and Dr. Stanalajczo's use of email." (*Id.*, PageID.898.)  She recommended that Dr. Stanalajczo "be removed from clinical teaching, use of U-M IT resources[,] and

11

having access to the dental building until he has" (1) watched videos addressing both the proper use of "reply all" in email correspondence and how to be "a professional" and (2) prepared a written summary of the videos and a reflection on  both his use of email and "[h]is understanding of" the Dental School's "expected standards for professional interactions with colleagues[.]" (*Id.*, PageID.898-899.)

Dr. Johnson transmitted her report to the Executive Committee of the Dental School (the "EC"). (*See* Johnson Dep. at 182:13-15, ECF No. 48-11, PageID.876; Confidential Workplace Investigation Report, ECF No. 48-13, PageID.890.)  The EC was comprised of Professors Dan Chiego, Alexandre DaSilva, Darnell Kaigler, Tae-Ju Oh, and Berna Saglik. (*See* Hu's Resp. to Pl.'s Interrog. No. 1, ECF No. 50-12, PageID.1300.)  The EC agreed with Professor Johnson's recommendations that Dr. Stanalajczo should be required to watch the videos and write the reflection piece, and the EC gave final approval to Professor Johnson's report. (*See* Hu's Resp. to Pl.'s Interrog. No. 3, PageID.1300-1301.)  The final version of the report, as adopted by the EC, provided that Dr. Stanalajczo should be advised that his failure to watch the videos and prepare his reflection piece "would be grounds for further disciplinary action, up to and including dismissal." (Confidential Workplace Investigation Report, ECF No. 48-13, PageID.899.[2])

---

[2] There has been some suggestion in the motion papers that as originally drafted, Professor Johnson's report said that Dr. Stanalajczo's failure to watch the videos and write the reflection piece "could" be grounds – instead of "would" be grounds – for

On October 14, 2022, Dr. Johnson sent the final report to Dr. Stanalajczo. (*See id.*, PageID.890.)   Six days later, Dr. Stanalajczo responded that he "ha[d] no intention of watching the videos or providing U of M with a written summary as to what he has learned from them." (10/20/2022 Letter, ECF No. 48-19, PageID.962.) He did not watch the videos. (*See* Stanalajczo Dep. at 57:19-20, ECF No. 48-2, PageID.784.)   On November 1, 2022, Dr. Johnson terminated Dr. Stanalajczo's employment. (*See* Johnson Dep. at 203:8-205:24, ECF No. 48-11, PageID.877.) She says that she did so because he neither watched the videos nor prepared a reflection piece. (*See id.*)

## G

On June 27, 2023, Dr. Stanalajczo filed this civil action. (*See* Compl., ECF No. 1.)   In the now-pending Second Amended Complaint, Dr. Stanalajczo brings two counts of First Amendment retaliation under 42 U.S.C. § 1983. (*See* Second Am. Compl., ECF No. 19.)   The counts are based upon alleged retaliation for two different instances of purported protected speech.  In Count I, Dr. Stanalajczo alleges that he was retaliated against for filing his complaint with MIOSHA. (*See id.* at ¶ 60, PageID.229.)   In Count II, he claims that he was retaliated against for his speech at the schoolwide forum. (*See id.* at ¶ 76, PageID.233.)   Dr. Stanalajczo names as

additional disciplinary action, up to and including termination of employment.  The Court need not determine the precise wording of the original version of the report because it is not material to the basis of the Court's decision.

Defendants, in their individual capacities, Jacques Nor, the Dental School's Dean; Jan Hu, the Interim Dean of the Dental School at the time of the alleged retaliation; Brandonn Perry, the Dental School's Director of Safety and Infection Prevention; Lynn Johnson, Professor and Associate Dean for Faculty Affairs and Institutional Effectiveness at the Dental School; and EC members Dan Chiego, Alexandre DaSilva, Darnell Kaigler, Tae-Ju Oh, and Berna Saglik.  He also names Nor in his official capacity as Dean of the Dental School.

Now before the Court is Defendants' motion for summary judgment. (*See* Mot., ECF No. 48.)  In the motion, Defendants argue that Dr. Stanalajczo's claims fail on the merits because, among other things, the speech underlying the claims was not protected under the First Amendment.  They also argue that even if Dr. Stanalajczo's claims did not fail on the merits, they would still be entitled to summary judgment on the claims against them in their personal capacities based upon qualified immunity.

The Court held a hearing on the motion on June 12, 2025, and is now prepared to rule on the motion.

## II

As noted above, Defendants seek summary judgment on the grounds that Dr. Stanalajczo's claims fail on the merits and that they are entitled to qualified immunity in their individual capacities.  The Court need not and does not reach

Defendants' qualified immunity arguments because, for the reasons explained below, the Court agrees with Defendants that Dr. Stanalajczo's claims fail on the merits.

Defendants attack the merits of Dr. Stanalajczo's claims under Rule 56 of the Federal Rules of Civil Procedure. Under that rule, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

### III

### A

In order to prevail on his First Amendment retaliation claims, Dr. Stanalajczo must show that: "(1) he engaged in protected speech; (2) the [Defendants] took an adverse action against him; and (3) there is a causal connection between the

15

protected speech and the adverse action." *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024).   The Court focuses here on the first element – whether Dr. Stanalajczo's speech was protected.  In order to satisfy that element, Dr. Stanalajczo must demonstrate, among other things, that he spoke "as a private citizen" rather than "as a public employee," *DeCrane v. Eckart*, 12 F.4th 586, 595 (6th Cir. 2021), and that his "speech was on a matter of public concern." *Josephson*, 115 F.4th at 783–84.  He has not made the required showing with respect to either his statements at the schoolwide forum or his MIOSHA complaint.

## B

The Court begins with Dr. Stanalajczo's statements at the schoolwide town hall.  They are not protected because Dr. Stanalajczo did not speak at the forum as a private citizen; instead, he spoke as a public employee.

## 1

While the Court usually begins its legal analysis by identifying the controlling case law and applying it to the facts, it is helpful to begin here by applying simple common sense to the question of whether Dr. Stanalajczo spoke at the forum as a private citizen or public employee.  Doing so quickly reveals that he spoke as a public employee.  The forum was organized and conducted by his employer.  He was invited to participate because he was an employee.  The purpose of the forum was to hear the views of employees like Dr. Stanalajczo (and the views of students).

And the main topic addressed at the forum was the conditions under which employees like Dr. Stanalajczo were working in the Clinic. Simply put, the forum provided an opportunity for Dental School employees like Dr. Stanalajczo to voice their opinions to their employer about matters related to the conditions of their employment. Under these circumstances, it would not make any sense to conclude that Dr. Stanalajczo participated in the forum as a private citizen rather than in his capacity as an employee of the Dental School.

**2**

Applying controlling precedent confirms this common-sense conclusion. Whether a public employee spoke as a private citizen or as an employee turns on whether he made his statements "pursuant to [his] official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If he did so, then he spoke in his capacity as a public employee; if not, then he spoke as a private citizen. *See id.*

Determining whether an employee spoke pursuant to his official duties is often "challenging." *Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 464 (6th Cir. 2017). To make that determination, a court must undertake a "practical" and "fact-specific inquiry into the 'duties an employee actually is expected to perform.'" *Barton v. Neely*, 114 F.4th 581, 589 (6th Cir. 2024) (quoting *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010)). "In conducting th[at] inquiry, [a court] look[s] to the 'content and context' of the statement,

consulting several non-exhaustive factors, including 'the speech's impetus; its setting, its audience; and its general subject matter.'" *Id.* (first quoting *Fox*, 605 F.3d at 348; then quoting *Mayhew*, 856 F.3d at 464).  A court should also consider "whether the speech was made within or outside of the 'ordinary chain of command.'" *Id.* (quoting *Fox*, 605 F.3d at 349–50).  Here, all of the factors point in the same direction: that Dr. Stanalajczo spoke as an employee of the Dental School rather than as a private citizen.

First, the "impetus" for Dr. Stanalajczo's speech at the schoolwide forum was an invitation from his employer – the Dental School – to attend the forum and share his opinions concerning the working conditions in the Clinic.  That is significant because where an employee is "specifically asked by [his] employer . . . to comment about the very matters that [his] speech addressed," the speech is "more closely linked to [his] official duties." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544–45 (6th Cir. 2007) (holding that plaintiff spoke in capacity as employee rather than as a private citizen because, among other things, she made her statements in response to a request for input from an agent of her employer).

Second, the setting of Dr. Stanalajczo's speech further confirms that he spoke as an employee.  Again, he made his comments at a forum organized and conducted by his employer.  And the public was not invited to the forum.  Instead, attendance was limited to Dental School employees and students.

Third, Dr. Stanalajczo made his statements to those at the top of his chain of command, and he did so at their invitation. Indeed, a primary objective of the forum was to give Clinic employees an opportunity to directly address the Dental School leaders – *i.e.*, the Interim Dean of the Dental School and the Associate Dean for Patient Care – who were hosting the forum. That Dr. Stanalajczo reported his concerns "up the chain of command" as he was invited to do suggests that he spoke "in the course of performing [his] job." *Fox*, 605 F.3d at 350 (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008)). Stated another way, "[s]peech to supervisors is more likely to be speech as a[n] [employee] as compared to speech to outside individuals." *DeCrane*, 12 F.4th at 596.

Fourth (and similarly), the audience for Dr. Stanalajczo's statements further indicates that he was speaking as an employee. His intended audience was primarily the Dental School administrators who were leading the discussion at the forum. He directed his comments to them. And while he also offered his statements for consideration by the other attendees at the forum, those individuals were all members of the Dental School community who were closely tied to his employment.

Finally, the subject matter of Dr. Stanalajczo's speech weighs in favor of a finding that he spoke as an employee. He was addressing the sub-standard conditions in his workplace and complaining that, among other things, the Dental

School was not treating its employees properly.  He had an interest in the working conditions because he was an employee, not in his capacity as a private citizen.

For all of these reasons, the Court concludes that Dr. Stanalajczo spoke at the forum in his capacity as a Dental School employee, not as a private citizen, and that his speech at the forum was therefore not protected.[3]

### 3

Dr. Stanalajczo counters that he spoke at the town hall as a private citizen, not an employee, because his actual employment duties did not include sharing his concerns about workplace conditions at after-hours, voluntary events like the schoolwide forum. (*See* Resp., ECF No. 50, PageID.994.)  He says that his duties as an adjunct professor were limited to teaching students how to practice dentistry. (*See id.*)  Since he was not paid to raise complaints at optional school events like the forum, he says, his speech at the forum was not part of his duties. (*See id.*)  Thus, he concludes, he did not speak as an employee at the forum. (*See id.*)  This is a serious argument.  But the Court cannot accept it for at least two reasons.

First, the argument rests upon an unduly narrow view of job duties.  Contrary to Dr. Stanalajczo's contention, those duties are not strictly limited to the specific

---

[3] Employers in Michigan do not have free reign to retaliate against employees for speech made pursuant to their official duties.  While such retaliation "does not violate the First Amendment," it may "give rise to antidiscrimination, whistleblower, or labor-contract claims," among others. *Weisbarth*, 499 F.3d at 546.   Dr. Stanalajczo did not assert any such claims in this action.

tasks that an employee is paid to perform.  Indeed, "most jobs carry with them an inherent duty of internal communication." *Boulton v. Swanson*, 795 F.3d 526, 533 (6th Cir. 2015).  Stated another way, "[i]mplicit in [the] duty to perform [one's job] is the duty to inform . . . those that would appear to have the most need to know and best opportunity to investigate and correct the barriers to [one's] performance." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1165 (11th Cir. 2015).  Thus, an employee speaks pursuant to his official duties, not as a private citizen, when he "report[s] conduct that interfere[s] with [his] ordinary job duties." *Id.*

That is exactly what Dr. Stanalajczo did here.  He reported to the leadership of the Dental School that the requirement to use the gowns was interfering with his ability to teach dentistry.  In making that report, he was discharging his "inherent duty" to communicate to his employer matters that were hindering his ability to discharge his express duties. *See Boulton*, 795 F.3d at 533.  He thus spoke as an employee. *See Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364 (6th Cir. 2007) (concluding that dog trainer's memo to supervisor complaining about dog training cutbacks was made pursuant to the trainer's official duties even though raising such complaints was not within the trainer's express day-to-day duties); *Alves*, 804 F.3d at 1164–65 (holding that employees spoke pursuant to their duties when they wrote memorandum "in furtherance of their ability to fulfill their duties with the goal of

21

correcting [their supervisor's] alleged mismanagement, which interfered with [their ability] to perform.").

Second, Dr. Stanalajczo has not cited a single case in which any federal court has held that an employee spoke as a private citizen, rather than in his capacity as employee, when making statements like he (Dr. Stanalajczo) made under circumstances like those at issue here.  In arguing that he spoke as a private citizen, Dr. Stanalajczo cites only the Supreme Court's decisions in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Lane v. Franks*, 573 U.S. 228 (2014).  While those cases are, of course, important because they establish the governing legal framework, neither decision applies that framework to circumstances that resemble those at issue here.  Dr. Stanalajczo's failure to cite case law that directly supports his contention that he spoke as a private citizen suggests to the Court that the position is not tenable.

## 4

For all of these reasons, Defendants are entitled to summary judgment on Dr. Stanalajczo's First Amendment retaliation claim based upon his speech at the forum (Count II of the Second Amended Complaint).

## C

The Court next turns to Dr. Stanalajczo's MIOSHA Complaint.  The speech in that complaint was not protected because it did not address a matter of public concern.

Speech concerns the public "when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "To determine whether speech involves a matter of public concern, [courts] consider 'the content, form, and context of the statement, as revealed by the whole record.'" *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 760 (6th Cir. 2022) (quoting *Connick,* 461 U.S. at 147–48). The "mere fact that the employee's job dealt with public health or welfare—which, in a general sense, concerns the public—does not make the employee's speech a matter of public concern." *Jennings v. Cnty. of Washtenaw*, 475 F.Supp.2d 692, 706 (E.D. Mich. 2007), *abrogation on other grounds recognized by Talhelm v. ABF Freight Sys., Inc.*, 364 F. App'x 176, 183 n.2 (6th Cir. 2010).

Dr. Stanalajczo's MIOSHA complaint addressed a discrete issue of employee working conditions in the Clinic, not a matter of public concern. (*See* MIOSHA Complaint, ECF No. 19, PageID.243.) In that complaint, Dr. Stanalajczo observed that the Dental School "makes [Clinic] employees" wear the gowns. (*Id.*) And he reported that the gowns "create[d]" both "a known issue with body overheating" and "a heat illness." (*Id.*) He concluded that the Dental School's requirement that faculty wear the gowns in the Clinic "caus[ed] employees['] health to be sacrificed[.]" (*Id.*) Notably, Dr. Stanalajczo did not say in the MIOSHA Complaint that the gowns'

23

impact on the health of Clinic employees posed any threat to the safety or well-being of the patients who visited the Clinic for dental care or to the public at large.[4]  Simply put, the "focus" of the MIOSHA Complaint was "not the *public's* safety, but rather only that the [Clinic] employees have a 'safe and comfortable' working environment." *Jennings*, 475 F.Supp.2d at 706 (emphasis in original).   For that reason, Dr. Stanalajczo's MIOSHA Complaint did not address a matter of public concern. *See id.* at 706–07 (holding that an employee's complaints to supervisors about working conditions that supposedly jeopardized her "safety" were not a matter of public concern); *Hester v. City of Flint*, No. 06-13552, 2008 WL 2397632, at *12 (E.D. Mich. June 11, 2008) (holding that an employee's complaint to MIOSHA that he had been exposed to contaminated soil did not address a matter of public concern).

Dr. Stanalajczo's MIOSHA Complaint stands in sharp contrast to other such complaints that have been deemed to address a matter of public concern.   The

---

[4] The word "patients" does appear twice in the MIOSHA Complaint.  But Dr. Stanalajczo did not suggest that patients were at risk.  Instead, he used the term "patients" first to contextualize the reason for wearing the gowns – to ensure Clinic staff wore proper PPE while treating patients. (*See id.*, stating the Dental School "makes their employees wear [the gowns] while treating patients.")  The second time he used the word patients was in the context of identifying the group of employees who were forced to wear the gowns: "The employer has been made aware of the problem and has repeatedly failed to correct it causing employees['] health to be sacrificed as a result. They choose to ignore complaints over the health of *those working and providing care to patients*." (MIOSHA Complaint, ECF No. 19, PageID.243; emphasis added.)

complaints in those cases clearly touched upon health and safety risks to individuals outside of the workplace.  For instance, in *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F.Supp.3d 842, 847, 852 (E.D. Mich. 2015), the court held that an employee's complaints to MIOSHA and to the news media about a "possible asbestos hazard" at a local school involved a matter of public concern because the hazard "posed a danger to workers, members of the public, and school children."  Likewise, in *Whittie v. City of River Rouge*, No. 14-10070, 2015 WL 4935562, at \*1–3 (E.D. Mich. Aug. 18, 2015), the court held that a public safety officer's complaint to MIOSHA involved a matter of public concern where the officer reported that the municipal fire department suffered from a "lack of standard operating procedures for fire suppression" – procedures that are obviously tied to public safety.  The contrast between these cases and Dr. Stanalajczo's MIOSHA complaint underscores that his complaint – which focused on working conditions that solely impacted Clinic employees – did not involve a matter of public concern.

Dr. Stanalajczo has not cited any decisions in which any court has held that statements like those in the MIOSHA Complaint address a matter of public concern. He primarily relies on *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564 (6th Cir. 1997) and *McLaughlin v. Sullivan Cnty. Bd. of Educ.*, No. 20-CV-00243, 2021 WL 3744803 (E.D. Tenn. Aug. 24, 2021), but the statements in those cases bear little resemblance to those in the MIOSHA Complaint.  In *Chappel*, an

emergency medical technician complained about (1) the "gross mismanagement" of a public ambulance district in a manner that threatened its ability to provide appropriate emergency service and (2) the "misappropriation of public monies." *Chappel*, 131 F.3d at 578. The Sixth Circuit explained that these matters "are rightly 'near the zenith' of public concern." *Id*. Unlike the plaintiff in *Chappel*, Dr. Stanalajczo's MIOSHA complaint did not say that any practices of the Dental School threatened the public's safety or the public fisc. In *McLaughlin*, the plaintiff spoke about a public school's possible "return[] to in-person learning during the COVID-19 pandemic." *McLaughlin*, 2021 WL 3744803, at *3. The court held that that statement – raising a concern about the spread of a highly-contagious disease as a pandemic raged – "unquestionably" touched on "a matter of public concern." *Id*. Dr. Stanalajczo's MIOSHA Complaint raised no similar concerns about a threat to the public.

For all of the reasons explained above, the Court concludes that Dr. Stanalajczo's MIOSHA complaint was not on a matter of public concern, and thus, was not protected speech. Accordingly, Defendants are entitled to summary judgment on Dr. Stanalajczo's First Amendment retaliation claim that is based upon his MIOSHA complaint (Count I of the Second Amended Complaint).[5]

---

[5] Employers in Michigan do not have free reign to retaliate against employees who file complaints with MIOSHA that do not address a matter of public concern. An employer who so retaliates may face at least two types of claims: (1) an

## IV

For all of the reasons explained above, Defendants' motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 17, 2025

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 17, 2025, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

---

administrative claim under MIOSHA's antiretaliation provision, Mich. Comp. Laws § 408.1065(2), and (2) a tort claim for discharge in violation of Michigan public policy. *See Stegall v. Res. Tech. Corp.*, -- N.W.3d. --, 514 Mich. 327, 342 (2024). Dr. Stanalajczo did not assert either of these claims in this action.